AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 10330 Hotel Avenue NE, Albuquerque, NM 87123 Room 208 and white Dodge Durango bearing Texas license plate HKP7421 VIN 1C4DHAG1DC672546 | ) ) ) |

Case No. **22 MR 1712**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 | Distribution and possession with intent to distribute controlled substances; |
| 21 U.S.C. 846 | Conspiracy to distribute and possess with intent to distribute controlled substance |

The application is based on these facts:

The affidavit of Special Agent Victor Avila is incorprated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Victor Avila, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__Telephonically Sworn and Electronically Signed__ *(specify reliable electronic means)*.

Date: __November 15, 2022__

_____
*Judge's signature*

City and state: __Albuquerque, New Mexico__

Honorable Jerry H. Ritter, Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Victor Avila, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I, your affiant, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search and seizure for the items described in Attachment B found in the following the TARGET LOCATION, further described in Attachment A: 10330 Hotel Avenue NE, Albuquerque, NM 87123 Room 208 (TARGET LOCATION) and a white Dodge Durango bearing Texas license plate HKP7421 VIN 1C4DHAG1DC672546 (TARGET VEHICLE).

2.      The affiant is a Special Agent (SA) for the Department of Homeland Security, U.S. Immigration & Customs Enforcement (ICE), Homeland Security Investigations (HSI), and has been employed by ICE as such since April 2018. Prior to the affiant's position with ICE, the affiant was a Border Patrol Agent with the United States Customs and Border Protection from July 2012 until April 2018. The affiant has been a special agent since 2018, and he is currently assigned to the Homeland Security Investigations Albuquerque office, where it is the affiant's duties to investigate violations of Immigration and Customs laws, which include narcotics crimes, financial crimes, false and fraudulent use of identification documents, immigration law crimes, and other violations of the United States Code of Titles 18 and 21.

3.     The affiant successfully completed eleven weeks of Criminal Investigator Training at the Federal Law Enforcement Training Center in Glynco, Georgia (FLETC). In addition, the affiant completed seventeen weeks of Border Patrol Agent Training with United States Border Patrol Academy at FLETC (Artesia, NM). The affiant has received training in investigating and enforcing immigration and customs statutes. The affiant holds a bachelor's degree in social science from The Evergreen State College and a Master of Criminal Justice Administration and Security Degree from University of Phoenix.

4.     As an HSI Special Agent, your affiant has received extensive training and practical experience pertaining to federal criminal procedures, federal criminal statutes, United States Immigration and Nationality law, United States Customs laws and regulations, and other federal and state laws pertaining but not limited to: Alien Smuggling/Human Trafficking, fraudulent document manufacture and sales; the importation and distribution of controlled substances, firearms, commercial fraud, counter proliferation investigations, money laundering and financial investigations, and conspiracy.  Your affiant is authorized, and presently assigned to investigate violations of Titles 8, 18, 19, and 21 of the United States Code as well as other federal violations of law.  Your affiant has also acquired knowledge and information about such offenses, and the various means and methods by which they are furthered from numerous sources, including formal and informal training from other law enforcement officers, investigators, and Special Agents; interviews of informants and arrestees, and interviews of other knowledgeable individuals.  As a result, your affiant, and other agents assisting in this investigation are, familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations (DTOs) to purchase, transport, store, and distribute drugs and to hide profits

2

generated from those transactions.   Your affiant also has experience in analyzing and interpreting

drug codes and cryptic dialogue used by drug traffickers.  Your affiant is aware that DTOs are

concerned about the efforts law enforcement make to disrupt and dismantle their activities.

5.      The facts in this affidavit come from your affiants' personal observations, training

and experience, and information obtained from other agents and witnesses. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant and does

not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

6.      Your affiant believes there is probable cause that an unknown male has

committed, is committing, and will continue to commit offenses involving violations of, *inter

alia*:

> a.      21 U.S.C. § 841 – Distribution and possession with intent to distribute
> controlled substances;
>
> b.      21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to
> distribute controlled substances;

## EVIDENCE SOUGHT DURING SEARCH

7.      Based on your affiants training, experience, and participation in this and in similar

investigations, believes that individuals involved in illegal trafficking of controlled substances

often conceal evidence of their drug trafficking activities in their residences and businesses, or

the residences of friends or relatives, and in surrounding areas to which they have ready access

such as garages, carports, storage units, and outbuildings.  They also conceal evidence in

vehicles, including vehicles outside of their residences and businesses, so that they have ready

access to it and so that they can hide it from law enforcement, including law enforcement

officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas or units and safety deposit boxes or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging, and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

8.      Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

9.      Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

10.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers, and co-conspirators.  These records may be

maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

11.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

12.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

13.     Drug traffickers often use storage facilities for drugs and other items related to

trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money, and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money, and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes, and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

14.     Other evidence of transportation, ordering, possession, and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

15.     Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash

earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

16.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate, and businesses, both real and fictitious.  They also try to secret, transfer, and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

17.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their

person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

18.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

19.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences, or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these

8

devices to take their photographs and videos.

20.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses, or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

21.     Your affiant knows that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

22.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

23.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored, or sent over communication networks. Your affiant knows that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for

nearly any environment, including a commercial business or residence. Your affiant knows that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

24.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts, or scanned into digital format and stored on computers and related digital media.

25.     A list of items agents seek authority to seize is in Attachment B.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found at the TARGET LOCATION or in TARGET VEHICLE, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on

computers, digital media and other storage media.  For this reason, your affiant submits that if a computer, digital medium, or storage medium is found at the TARGET LOCATION or in TARGET VEHICLE, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

   a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or

11

months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

### October 26, 2022, Controlled Delivery of Fentanyl

29.     On October 26, 2022, law enforcement intercepted 11.4 kilograms of fentanyl enroute to Albuquerque. The courier (referred to herein as Cooperating Source or CS) agreed to complete a controlled delivery. Law enforcement personnel replaced the fentanyl with approximately 11.4 kilograms of "sham" fentanyl. Sham is normally a substance or material designed to look like a controlled substance. The sham fentanyl was to be delivered to an unknown person. Before the delivery, an HSI Under Cover Agent (UCA) and the CS arranged to meet this unknown male in Albuquerque to complete the delivery in exchange for approximately $47,000.00.

30.     Initially, the CS called the supplier who he referred to as "CHAPO." Chapo told the CS to meet with him at the La Quinta Inn located at 2011 Menaul Blvd. in Albuquerque, NM. However, the UCA advised the CS to call the unknown male and change the location to the Walmart located at 2701 Carlisle Blvd NE in Albuquerque, NM. The UCA and CS were parked at the northeast parking lot of Walmart. At approximately 1434 hours, the unknown male advised the CS he was about to arrive and that he was driving a white Cadillac. A white Cadillac registered to Armando JIMENEZ arrived with a male driver and a female passenger. The CS exited his vehicle and got into the white Cadillac bearing New Mexico license plate UNM45397. The UCA confirmed that the delivery was completed, and the signal was given to take the unknown male and female passenger into custody.

31.     The unknown male, later identified as Eric John Curtis JARAMILLO (YOB: 1990), resisted arrest by evading law enforcement and fleeing from the Walmart parking lot in the white

Cadillac. The CS was able to jump free from the moving vehicle unharmed. A New Mexico State Police helicopter observed the white Cadillac as it fled from the scene. After leaving the Walmart parking lot, the white Cadillac made its way to Interstate 40 and proceeded east bound. The white Cadillac was observed driving at a high rate of speed, ultimately departing Interstate 40 onto Eubank Blvd., and traveling toward Extra Space Storage, located at 201 Eubank Blvd. SE. While in proximity of the Extra Space Storage, the white Cadillac made a U turn on Eubank, heading north, and entered westbound Interstate 40. The white Cadillac stopped on Interstate 40 westbound near the Eubank exit. JARAMILLO exited the vehicle and fled on foot into the drainage tunnels that parallel Interstate 40. It was ascertained later that the unknown female passenger, later identified as Veronica FLORES (YOB: 1992) was dropped off in the parking garage of Target located at 2120 Louisiana Blvd NE out of the view of the pursuing agents and helicopter. She was later viewed on surveillance video hastily walking into Target with a black backpack. A K9 track of the immediate area was conducted and then inside the tunnels but JARAMILLO was not located.

32.     The white Cadillac was found to be registered to Armando JIMENEZ. Law enforcement agents obtained a copy of JIMENEZ driver's license photograph.

33.     On October 26, 2022, an inventory of the white Cadillac was completed. Law enforcement agents discovered a receipt for Extra Space Storage in the amount of $270 and dated for October 25, 2022, located between the driver's seat and center consol. Agents believe JARAMILLO intended to go to this location on the date he was fleeing from law enforcement on October 26, 2022.

34.     On November 2, 2022, agents served a subpoena to the Extra Space Storage to ascertain who had rented the storage unit. The storage unit is leased in the name Isaac Joseph

VALDEZ III. After viewing security footage of the storage unit office on the day the unit was leased, agents observed a male matching JARAMILLO paying cash for the storage unit.

35.     On November 2, 2022, agents viewed the Extra Space Storage parking lot surveillance camera footage from October 25, 2022, and observed JARAMILLO get into the white Cadillac involved in the October 26, 2022, pursuit.

36.     Law enforcement record checks of the name and New Mexico driver's license provided to Extra Space Storage during the lease signing did not match the individual who was viewed paying on October 25, 2022 (photo comparison).

## **TARGET LOCATION**

37.     Agents have determined JIMENEZ was not the driver involved in the controlled delivery and subsequent pursuit, however the Extra Space Storage receipt found in the white Cadillac led to the identification of JARAMILLO.

38.     Affiant conducted a photographic comparison of JARAMILLO's driver's license photo, JARAMILLO's jail photo, the helicopter video from the pursuit on October 26th, 2022, and the surveillance video from Extra Space Storage, and determined that JARAMILLO was depicted in each of them. While it is established above that there is probable cause to believe that the JARAMILLO was the individual involved in the narcotics violations, it should be noted that the white Cadillac has not been reported stolen by JIMENEZ. It is probable that JARAMILLO keeps additional current and historical documentary evidence of his narcotics dealings at a trusted location such as a storage unit or the TARGET LOCATION.

39.     On November 15, 2022, Homeland Security Investigations special agents and officers executed search warrants at the Extra Space Storage and 625 Jane Street NE, both in Albuquerque, New Mexico. Storage unit G-1 yielded an AR-15 type rifle (S/N NS345937) and an AK Visca Pistol (S/N SV7P006658). JARAMILLO has been seen at storage unit G-1 and is prohibited from possessing firearms due to being a felon.

40.     Information gathered on November 14, 2022, demonstrated that JARAMILLO and FLORES were staying at the TARGET LOCATION the day before the execution of the search warrants at 625 Jane Street NE and the Extra Space Storage. Surveillance units staged in the area of the TARGET LOCATION were able to photograph the occupants exiting the room. These photos were sent to SA Avila who was able to positively identify JARAMILLO.

41.     On November 14, 2022, SA Avila obtained video surveillance from the TARGET LOCATION which showed JARAMILLO, FLORES, and VALDEZ unloading multiple duffle bags and plastic tubs from the JARAMILLO's vehicle (TARGET VEHICLE) onto a cart. They then took these items to the TARGET LOCATION. VALDEZ is the only registered hotel guest for the TARGET LOCATION.

42.     On November 15, 2022, while search warrants were being executed at search warrants at 625 Jane Street NE and the Extra Space Storage, surveillance units observed JARAMILLO and FLORES exit the TARGET LOCATION, go to the TARGET VEHICLE, and return to the TARGET LOCATION on several occasions. During these trips, JARAMILLO was observed carrying small items to the TARGET VEHICLE from the TARGET LOCATION. Law

enforcement believed that JARAMILLO may have been tipped off by one of the occupants at the 625 Jane Street NE search warrant.

43.     On November 15, 2022, at approximately 0700 hours Homeland Security Investigations Special Response Team (SRT) departed the 625 Jane Street NE search warrant and headed to the TARGET LOCATION.  Law enforcement sought to contact JARAMILLO to arrest him on an extraditable state arrest warrant for probation violation stemming from an assault with a deadly weapon charge. While SRT was in route to the TARGET LOCATION, JARAMILLO and FLORES came outside of the TARGET LOCATION, observed law enforcement, and fled on foot from the TARGET VEHICLE to an adjacent hotel.

44.     JARAMILLO attempted to climb over the wrought iron fence but impaled himself doing so and got hung up on the fence. FLORES was seen observed running away toward a gas station where she was apprehended.

45.     No narcotics were located at the Extra Space Storage nor the 625 Jane Street NE residence during search warrants executed on November 15, 2022. Based on surveillance, video surveillance, JARAMILLO's criminal history, his flight from law enforcement, officers' observations, and his role in the October 26, 2022, controlled delivery, it is probable to believe that JARAMILLO has narcotics and other indicia of drug trafficking stored in the TARGET LOCATION and the TARGET VEHICLE at the Sure Stay Best Western hotel.

46.     Law enforcement returned to the TARGET LOCATION because VALDEZ was still being pursued. The TARGET LOCATION's door was cracked open. Agents noticed the door was cracked open upon their approach to the TARGET LOCATION. Agents announced

17

and peered through the crack in the door, instantly smelling the odor of raw marijuana. After smelling raw marijuana agents entered the TARGET LOCATION to conduct a protective sweep. During the protective sweep of the TARGET LOCATION law enforcement observed a handgun with an extended magazine, drug paraphernalia to include a marijuana pipe, and the room smelled strong with the odor of raw marijuana. Additionally, a video surveillance camera was in the TARGET LOCATION window.

47.     Law enforcement exited the TARGET LOCATION following the protective sweep and held it pending a search warrant. The United States requests the Court disregard the observations during the protective sweep but included the results in this affidavit in the interest of transparency.

48.     JARAMILLO and FLORES were both apprehended after they fled the Sure Stay Best Western hotel parking lot. FLORES was arrested at a gas station approximately a block away. JARAMILLO and FLORES were transported to the Homeland Security Investigations office for further processing.

49.     A canine open-air sniff of the exterior area of the TARGET LOCATION was completed with a canine alert to the presence of narcotics. The canine did not alert to any other nearby rooms. Following the TARGET LOCATION open-air sniff alert, a canine open-air sniff of the TARGET VEHICLE was completed with an alert for the presence of narcotics. According to the canine's handler, the canine is trained to alert on narcotics excluding marijuana. The vehicle is located at the Homeland Security Investigations office.

18

50.     In my training and experience sophisticated narcotics traffickers will often use a location not in their name to operate from and to confuse tracking efforts. This serves as an additional degree of separation between their personal lives and their criminal undertakings from both their customers and law enforcement. In my experience narcotics traffickers will keep these financial records such as ledgers, customer and supplier contacts, and financial records (amongst other records) at their residence or a separate location like a storage unit so that they have the most control and access over these sensitive documents. This separation of the documentary evidence from the transactional process also serves as an additional measure to thwart law enforcement efforts to gather all of the evidence to proceed with the conspiracy or money laundering angles of narcotics trafficking investigations.

51.     In my training and experience narcotics traffickers who employ these tactics to facilitate their illicit sales will also store the proceeds of these illicit sales at their residence or a storage unit. This arrangement serves to provide control and access over the assets needed to continue their illicit trade as well as to support the lifestyle traffickers hope to enjoy from their illegal activities. This arrangement also helps protect these assets from seizure by law enforcement through the separation of the business from the personal.

52.     Additionally, in my training and experience narcotics traffickers will use both personal financial accounts as well as the accounts of trusted friends and family members to layer and obscure their illegally gained assets. This tactic obscures the origin and true owner of the assets. These financial records are likely to be kept close at hand in the residence for easy access and control by the trafficker and their accomplice.

19

53.     Based on the above information there is probable cause to believe that items listed in Attachment B will be located in the TARGET LOCATION and in the TARGET VEHICLE.

## **CONCLUSION**

54.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET LOCATION and TARGET VEHICLE described in Attachment A to seek the items described in Attachment B as containing evidence of violations of 21 U.S.C. §§ 841 and 846.

55.     This affidavit has been reviewed and approved by AUSA Joseph Spindle.

Respectfully submitted,

Victor Avila
Special Agent
Homeland Security Investigations

Telephonically sworn and electronically signed
on November 15, 2022:

THE HONORABLE JERRY H. RITTER
UNITED STATES MAGISTRATE JUDGE

20

<u>**ATTACHMENT A**</u>

    **1.**      The **TARGET LOCATION** is located at 10330 Hotel Avenue NE, Albuquerque New Mexico 87123.  This is a hotel room that has a beige door and a lock on the left side. The **TARGET LOCATION and TARGET VEHICLE** are located at the Sure Stay Best Western hotel on the south side of the building.

    **2.**      This warrant would authorize the search of room 208 and the **TARGET VEHICLE** at the **TARGET LOCATION** at the time of the search.

    **3.**      Photo 1, below, is a picture of **TARGET LOCATION** and its surroundings.  Photo 2, below, shows the front of the **TARGET VEHICLE**.

<u>**Photo 1**</u>



<u>**Photo 2**</u>



1

## ATTACHMENT B

Evidence related to the unlawful distribution of and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, including:

1. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

2. Paraphernalia for packaging cash drug proceeds including heat sealing devices, plastic packaging for cash, rubber bands, and money-counting devices;

3. Books, records, receipts, notes, ledgers, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

5. Books, records, receipts, notes, ledgers, airline tickets, money orders, wire transfer or money remittance records, and other information related to the receipt, expenditure and concealment or other disposition of income;

6. Cash, currency, financial instruments, and records relating to drug-trafficking income and expenditures of proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug-trafficking activities;

7. Photographs of individuals associated with the distribution of drugs, and of their property and their drugs;

8. Records and information reflecting names, nicknames, addresses, and telephone numbers of both current and past drug associates;

9. Safes, keys for safety-deposit boxes, hidden compartments and other secure locations, which often contain the proceeds of narcotics-trafficking activity, including, but not limited to, large amounts of United States currency;

10. Canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys;

11. Records and information concerning occupancy or ownership of the **TARGET LOCATION or TARGET VEHICLE** (described in Attachment A), such as utility and telephone bills, mail envelopes, leases, or addressed correspondence.

12. Seizure of cellular telephones;

13. Seizure of computers, tablets and other electronic devices;

14. United States currency;

15. Records and information depicting subscriber data and itemized telephone calls to other potential drug traffickers from residential telephone and cellular telephones;

16. Records and information indicating ownership, association, and utilization of vehicles, to include maintenance and improvements to the vehicles.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.